IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DAVID STEVENSON, et al.,           )
                                   )
            Plaintiffs,            )
                                   )
      v.                           ) Civ. Action No. 04-139-GMS
                                   )
WARDEN THOMAS CARROLL,             )
                                   )
            Defendant.             )

## MEMORANDUM

## I. INTRODUCTION

The plaintiffs, David Stevenson ("Stevenson"), Michael Manley ("Manley"), and Michael L. Jones ("Jones") ("the plaintiffs"), who proceed *pro se* and have been granted leave to proceed without prepayment of fees, filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging violations of their constitutional rights. The plaintiffs are housed at the James T. Vaughn Correctional Center ("VCC"), Smyrna, Delaware. Before the court is a motion for summary judgment filed by defendant Thomas Carroll ("Warden Carroll"), the former warden at the VCC and Stevenson's and Jones' oppositions thereto.[1]  (D.I. 90, 95, 98.)  Manley did not file a response to the motion for summary judgment. For the reasons that follow, the court will grant Warden Carroll's motion for summary judgment.

---

[1]Warden Carroll also filed a motion for leave to file excess pages, a motion for extension of time to file the motion for summary judgment, and a motion to strike Jones' memorandum in opposition to Warden Carroll's motion for summary judgment. (D.I. 77, 88, 106.) The court will grant the motion for leave to file excess pages and motion for extension of time, but will deny the motion to strike.

## II. BACKGROUND

This case was dismissed pursuant to a Rule 12(b)(6) motion and, on appeal, the United

States Court of Appeals for the Third Circuit reversed the dismissal. Following are the

complaint's allegations as discussed by the Third Circuit.

> Three detainees in the Delaware Correctional System - David Stevenson, Michael
> Manley, and Michael L. Jones - filed an action under 42 U.S.C. § 1983 against
> Warden Thomas Carroll, alleging violations of their substantive and procedural
> due process rights . . . . They assert that their allegations of placement in
> restrictive confinement state valid substantive and procedural due process claims .
> . . .
>
> At the time of their complaint, Stevenson and Manley were awaiting resentencing.
> Both had been convicted and sentenced to death in January 1997, but their
> sentences were vacated and remanded on or about May 30, 2001. At that time,
> they were moved off death row, and into the Security Housing Unit ("SHU").
> Stevenson was moved from the SHU to a less restrictive pre-trial facility in
> December 2003, but was returned to the SHU in January 2004. Neither one of
> them received a hearing or explanation for their transfers into the SHU. They
> were both subsequently re-sentenced to death on February 3, 2006.
>
> Jones was awaiting trial at the time of the complaint. Following a disruption at
> Gander Hill Prison in Wilmington, Delaware, he and several other inmates were
> moved to the SHU on or about February 19, 2003. Jones asserts that, like
> Stevenson and Manley, he was not afforded an explanation or hearing regarding
> his transfer into more restrictive housing. He does, however, state that he was
> alleged to have been involved in the riot at Gander Hill. Jones was subsequently
> found guilty of first-degree murder and sentenced to life imprisonment on
> September 16, 2005.

*Stevenson v. Carroll*, 495 F.3d 62, 64-65 (3d Cir. 2007).

The plaintiffs seek relief in the form of a transfer back into the general prison population,

monetary damages, and the establishment of a system of review for transfers of pretrial detainees

into the SHU. *Id.* at 65. Stevenson and Manley are now housed on death row and Jones is

housed in the area of the SHU reserved for sentenced inmates. *Id.* at 65 n.1. Accordingly, their

request for injunctive relief on the grounds that they are improperly confined pretrial detainees is moot. *Id.*

There are two areas at the VCC where pretrial detainees may be housed; the high security SHU pretrial unit ("the unit"), and the general population in B building. (D.I. 25, ex. A.) Detainees considered a security risk are housed in the SHU pretrial area. (*Id.*)

Following the reversal of his death sentence, Stevenson was housed in the SHU pretrial unit from May 31, 2001 until December 19, 2003 when he was transferred to the B Building for approximately one month. (D.I. 68 at 125; D.I. 75, Stevenson 2; D.I. 92, A123.) He returned to the SHU pretrial unit on January 20, 2004. (*Id.*) Upon resentencing, Stevenson was transferred to the housing unit for death row inmates. (D.I. 92, A123.)

On June 18, 2001, Stevenson's criminal attorney wrote to then Warden Snyder inquiring why Stevenson was transferred to "a punitive detainer block where his privileges have been dramatically reduced." (D.I. 68, 128.) Stevenson was notified on January 11, 2002 of a pretrial inmate administrative move based upon a pending penalty hearing of his death sentence "on hold" and disorderly threatening behavior and inmate demonstration. (D.I. 75, Stevenson 229.) Stevenson's housing assignment was reviewed in January 2003 and, on January 28, 2003, the IBBC (i.e., Institutional Base Classification Committee) approved the recommendation to house him in the SHU pretrial unit based upon his risk assessment score and an open first degree murder charge. (D.I. 75, Stevenson 109-111.) Stevenson was notified of the decision on January 28, 2003. (D. I. 75, Stevenson 112.) Stevenson wrote to then Deputy Warden McGuigan on March 5, 2003, complaining of the transfer and, particularly, that he was not allowed a television. (D.I. 68, 132.) He wrote to his counselor regarding his housing assignment, and she responded to

3

his inquiry on April 14, 2003. (D.I. 68, 1.) Stevenson received a second letter from his

counselor on August 4, 2003 regarding reconsideration of the issue. (*Id.* at 2.) Stevenson

received a number of disciplinary reports between 2001 and 2004. (D.I. 75, Stevenson 150-228,

230-240; D.I. 92, A123.)

Following reversal of his death sentence, Manley was housed in the SHU pretrial from

May 31, 2001 until he was resentenced to death and transferred to death row where he remains.

(D.I. 86, Manley 3; D.I. 92, A124.) Manley was notified on January 11, 2002 of a pretrial inmate

administrative move based upon a pending penalty hearing concerning his death sentence. (D.I.

86, Manley, 429.) Manley's housing assignment was reviewed in January 2003, and on January

28, 2003, the IBBC approved the recommendation to house him in the SHU pretrial unit based

upon his risk assessment score and an open first degree murder charge. (D.I. 86, Manley 87-89.)

Manley was notified of the decision on January 28, 2003. (D. I. 86, Manley 86, 90.) On

February 3, 2003, Counselor McFadden ("McFadden") responded to Manley's letter regarding

his housing assignment. (D.I. 96, A33.) McFadden told Manley that classifications were not

done on detainees, the new classification system was point based with points assigned by offense,

escape history, pending charges, criminal history, disciplinary history, etc., and that disciplinary

offenses during the last five years are considered. (*Id.*) She advised Manley that she would

discuss the level system with him. (*Id.*) On February 28, 2003, Counselor Kramer ("Kramer")

wrote to Manley regarding several letters he had written concerning his classification and quality

of life. (D.I. 96, A36.) Kramer advised Manley that his classification points placed him in

"max" and that his quality of life was being evaluated. (*Id.*) Manley received another letter from

his counselor on August 4, 2003 regarding reconsideration of the classification issue. (*Id.* at 34.)

4

Manley's criminal attorney wrote to Warden Carroll on January 20, 2004 inquiring why Manley

remained housed in the SHU pretrial unit (D.I. 68 at 158.)  Manley received a number of

disciplinary reports in 2002 and 2004.  (D.I. 86, Manley 297-304, 315-322; D.I. 92, A123.)

While Stevenson and Manley were housed in SHU pretrial, Warden Carroll authored a

memorandum to the Chief of the Delaware Bureau of Prisons ("BOP") dated June 25, 2003,

regarding complaints received by then DOC Commissioner Stanley Taylor ("Commissioner

Taylor") from Stevenson and Manley.[2]  Warden Carroll stated that "both of these inmates have

had death sentences overturned for conviction of Murder 1st Degree.  Both inmates are held

without bail and are viewed as security risks if housed in 'B' Building/Pre-trial."  (D.I. 75,

Stevenson 1; D.I. 86, Manley 1.)  Stevenson and Manley's second penalty hearing did not take

place until November 8, 2005 and both were resentenced to death on February 3, 2006.  *See*

*Manley v. State*, 918 A.2d 321, 324 (Del. 2007).

While awaiting trial, Jones was housed at the Multi-Purpose Criminal Justice Facility

(known at the time as Gander Hill and currently known as the Howard R. Young Correctional

Institution) ("Gander Hill") in Wilmington, Delaware.  On February 19, 2003, Jones was

involved in an incident, along with five other inmates.  (D.I. 79, Jones 1-2.)  An investigation

determined that the inmates engaged in a disturbance in an effort to harm a fellow inmate.  (*Id.* at

2.)  The report concluded that the six inmates demonstrated extreme violent behavior, that they

represented an extreme threat to the security of Gander Hill, and that the inmates should be

housed in a facility where the security level was higher than that at Gander Hill.  (*Id.*)  Jones was

---

[2]Stevenson had written to Commissioner Taylor on April 28, 2003.  (D.I. 72, S6-S11.)

transferred to the SHU pretrial unit at the VCC the same day where he remained until he was sentenced. (D.I. 79, Jones 7.)

Jones wrote to Mr. Drake on March 3, 2003, complaining of his transfer to the VCC. (D.I. 98, ex. F.) In the letter, Jones states that he was told the transfer was the result of "a fight" but complains that, if that was the case, why was he being punished when he received no write-up or hearing, and he did nothing to deserve the transfer. (D.I. 98, ex. F.) Jones wrote to Warden Carroll on March 11, 2003, inquiring why he had been transferred to the SHU pretrial unit. (D.I. 98, ex. B.) Jones wrote to Commissioner Taylor on May 11, 2003, to complain that Warden Carroll had placed him in the SHU pretrial unit, but that he received no notice of charges and had no opportunity to present his views on the housing assignment. (D.I. 98, ex. D.) On March 11, 2004, Jones wrote to the Governor of Delaware complaining that he remained housed in the SHU pretrial. (D.I. 98, ex. H.) The letter states that Jones was told by his criminal attorney that he remained in the SHU pretrial because of the warden at Gander Hill. (*Id.*) Jones' letter goes on to state that he was told by his counselor that he was not being punished. (*Id.*) Jones wrote to Deputy Warden Betty Burris on July 17, 2004, again complaining that he was housed in the SHU pretrial unit. (D.I. 98, ex. I.) Jones states that his counselor advised him that the SHU pretrial unit is for detainees with no bail and who have serious pending charges. (*Id.*)

Jones was convicted on January 27, 2005 of three counts of first degree murder and sentenced to three life sentences without the possibility of parole on September 22, 2005. (D.I. 92, A280-285); *Jones v. State*, 940 A.2d 1, 5 (Del. 2007). Jones remained housed in the SHU until June 3, 2010, when he was transferred to the Medium High Unit. (D.I. 79, Jones 6-7; D.I.

92, A124.)  Jones received a number of disciplinary reports in 2002, 2004, and 2005 while a

pretrial detainee.  (D.I. 79, Jones, 363-411, 412, 423; D.I. 92, A123.)

Warden Carroll states that, based upon the potential for Stevenson and Manley to again

receive a sentence of death, it was determined that they presented a significant risk if housed in

the B Building pretrial unit.  (D.I. 25, ex. A.)  According to Warden Carroll, prison officials

determined that it was inappropriate to house Jones in the B Building pretrial unit because of his

very serious pending charges and a number of inmate disciplinary rule infractions.  (D.I. 25, ex.

A.)  The court takes judicial notice that Jones, like Stevenson and Manley, had the potential to be

sentenced to death.  *See Jones v. State*, 940 A.2d at 7 (In a proof positive hearing on January 25,

2005, the State notified the court and Jones that it intended to seek the death penalty.).[3]  Warden

Carroll stated that once the plaintiffs were sentenced, they would be classified to a security level

pursuant to Department of Correction ("DOC") guidelines and procedures.  (D.I. 25, ex. A.)

According to Warden Perry Phelps ("Warden Phelps"), the current warden at the VCC,

the plaintiffs' charges were not the only reasons they were housed in the SHU pretrial.  (D.I. 92,

A1-A6.)  Consideration was given to Stevenson and Manley's conviction for murdering a

witness scheduled to testify against Stevenson.  (D.I. 92, A2.)  Prison officials reasonably

believed that Stevenson's and Manley's murderous conduct foreshadowed future similar conduct.

(*Id.* at A5.)  According to Warden Phelps, their contempt for the judicial process and the criminal

_____

[3]Following the penalty phase of Jones' trial, the jury recommended by a vote of eleven-to-
one on two of the first degree murder counts and ten-to-two on the third first degree murder
count, that Jones be sentenced to death. *Jones v. State*, 940 A.2d at 7.  However, prior to
sentencing, the United State Supreme Court decided *Roper v. Simmons*, 543 U.S. 551 (2005)
which made Jones ineligible for the death penalty because of his age. *Id.* Jones was 17 years, 8
months, when the crimes were committed. *Id.* at 5.

justice system was a basis for housing them in the SHU pretrial unit while they awaited resentencing. *Id.* In addition, officials at the prison determined that Stevenson and Manley presented a heightened flight risk and that a transfer to the SHU pretrial unit would lessen the heightened attention received by Stevenson and Manley as a result of pretrial publicity. *Id.* Prison records indicate that, prior to the time their death sentences were vacated, Stevenson and Manley were not viewed as management problems for the staff, despite write-ups. (D.I. 96, A37, A58.)

According to Warden Phelps, Jones was placed in the SHU pretrial unit following his involvement in a disturbance at Gander Hill that was believed to be in the furtherance of an effort to seriously injure or kill another offender. (D.I. 92, A2-4) Warden Phelps states that Jones' behavior and his associations with other offenders made him unsuitable for housing at Gander Hill. (*Id.* at A3.) Prison officials opted to move Jones to another facility to isolate his threat to offender Al O. Plant, Jr. who was housed at Gander Hill.[4] *Id.* Upon arrival at the VCC, prison officials determines that Jones' supervision history required that he be housed at the highest possible security setting available for pretrial detainees. *Id.*

Warden Phelps reviewed the prison records of the plaintiffs and found no evidence of any intent to house them at the SHU pretrial unit for the purpose of punishment. (D.I. 92, A6.) According to Warden Phelps, security staff was guided by the responsibility and duty to provide a constitutionally adequate, safe and secure prison facility. (*Id.* at A6.)

Richard Seifert, BOP Deputy Chief, states that the plaintiffs' housing status as SHU

---

[4]At the time, Jones was awaiting trial for the murder of Maneeka Plant Davis, the daughter of offender Al O. Plant, Jr. (D.I. 92, A4.)

pretrial detainees was an appropriate subject to grieve since it was not a classification decision. (D.I. 92, A210.) The only complaints specifically excluded from the inmate grievance process are those raising the issues of discipline, classification, and Parole Board decisions which have their own formal appeal mechanisms. (D.I. 92, A210, A214-15.) On July 6, 2003, Stevenson submitted a grievance complaining that he had been held in the SHU pretrial for more than two years, with no explanation for his housing assignment. (D.I. 81.) The grievance was accepted and returned. *Id.* Stevenson was told that "inmates do not have a choice of where they are housed. I suggest you submit a request to see your counselor and discuss it with him/her." (*Id.*) Stevenson did not appeal the denial. (D.I. 92, A211.) Neither Manley nor Jones submitted any grievances complaining of their housing status in the SHU pretrial unit. *Id.*

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the clams in question. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)

---

[5]Rule 56 was revised by amendment effective December 1, 2010. "The standard for granting summary judgment remains unchanged," and "[t]he amendments will not affect continuing development of the decisional law construing and applying these phrases." Fed. R. Civ. P. 56 advisory committee's note to 2010 Amendments.

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–461 (3d Cir. 1989). Pursuant to Rule 56(c)(1), a non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . ." Fed. R. Civ. P. 56(c) (1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–249. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586–587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. at 322.

The court is mindful that Manley did not file an opposition to Warden Carroll's motion for summary judgment. The court, however, will not grant the entry of summary judgment without considering the merits of Warden Carroll's unopposed motion. *Stackhouse v.*

10

*Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir. 1991) (holding that a district court should not have

granted summary judgment solely on the basis that a motion for summary judgment was not

opposed.").

Warden Carroll moves for summary judgment on the grounds that: (1) the plaintiffs have

failed to demonstrate any violation of their substantive due process rights; (2) the plaintiffs have

failed to demonstrate any violation of their procedural due process rights; (3) there is no evidence

of record to support the plaintiffs' allegations; (4) there is no proof of his personal involvement

and liability cannot be based upon a respondeat superior theory; (5) he is entitled to qualified

immunity; (5) the official capacity claims are barred by the Eleventh Amendment of the United

States Constitution; and (6) the plaintiffs failed to exhaust their available administrative

remedies.

## IV. DISCUSSION

### A. Administrative Remedies

The court turns first to the issue of exhaustion of administrative remedies, as it is

dispositive of the case. Warden Carroll moves for summary judgment on the grounds that the

plaintiffs failed to properly exhaust their administrative remedies prior to filing suit. Stevenson

and Jones respond that they exhausted all available remedies and, further, that administrative

remedies were unavailable because the issues raised are non-grievable.

The defendants conducted an exhaustive search and found no records to suggest that

Manley and Jones made any attempt to exhaust their administrative remedies. Stevenson,

submitted a grievance that was accepted and returned. Stevenson's submission of a grievance,

however, does not extend to the other plaintiffs.[6]

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong"). Warden Carroll has the burden of pleading and proving failure to exhaust administrative remedies as an affirmative defense in a § 1983 action. *Ray v. Kertes*, 285 F.3d 287, 295-96 (3d Cir. 2002).

Under 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). Exhaustion means proper exhaustion, that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006).

"[P]rison grievance procedures supply the yardstick for determining what steps are required for exhaustion." *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007). A prisoner must

---

[6]"Vicarious exhaustion" is not recognized in cases except in some circuits when it has been permitted in § 1983 class actions filed by inmates. *See Chandler v. Crosby*, 379 F.3d 1278 (11th Cir. 2004); *Meisberger v. Donahue*, 245 F.R.D. 627 (S.D. Ind. 2007) (allowing vicarious exhaustion in a class action), *cf. McGoldrick v. Werholtz*, 185 F. App'x 741 (10th Cir. 2006) (not published) ("vicarious exhaustion" rejected where a class had not been certified, on the grounds that a *pro se* plaintiff cannot in any manner represent another for any purpose).

complete the administrative review process in accordance with the applicable procedural rules in order to satisfy the exhaustion requirement of the PLRA. *Williams*, 482 F.3d at 639; *Spruill v. Gillis*, 372 F.3d 218, 228, 231 (3d Cir. 2004). Perfect overlap between the grievance and a complaint is not required by the PLRA as long as there is a shared factual basis between the two. *Woodford*, 548 U.S. at 95 ("The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance"). A futility exception to the PLRA's mandatory exhaustion requirement is completely precluded. *Nyhuis v. Reno*, 204 F.3d 65, 71 (3d Cir. 2000). The exhaustion requirement is absolute, absent circumstances where no administrative remedy is available. *See Spruill*, 372 F.3d at 227-28; *Nyhuis*, 204 F.3d at 67. A grievance procedure is not available, even if one exists on paper, if the defendant prison officials somehow prevent a prisoner from using it. *Mitchell v. Horn*, 318 F.3d 523 (3d Cir. 2003). If prison authorities thwart the inmate's efforts to pursue the grievance, administrative remedies may be presumed exhausted, as no further remedies are "available" to him. *Brown v. Croak*, 312 F.3d 109, 112-13 (3d Cir. 2002).

DOC administrative procedures provide for a multi-tiered grievance and appeal process. (D.I. 135, ex. 4 DOC Policy 4.4 (revised May 15, 1998)). First, the prisoner must file a grievance within seven days following the incident with the Inmate Grievance Chair for an attempt at informal resolution; second, if unresolved, the grievance is forwarded to the Grievance Resolution Committee for a determination, which is forwarded in turn to the Warden; and third, the Bureau Grievance Officer conducts the final level of review. *Id.*

There is no evidence of record that Manley exhausted his administrative remedies. With regard to Jones, he argues that "it is well known" that security issues, disciplinary issues, and

13

classification issues are non-grievable.  Although Jones wrote numerous letters, there is no

evidence of record that he submitted even one grievance regarding his housing assignment in the

SHU pretrial unit.  The record further reflects that Jones submitted numerous grievances, which

indicates that he was aware of the grievance system and, indeed, used the grievance system.

While Jones may have believed the issue was non-grievable, the benefits of exhaustion can be

realized only if the prison grievance system is given a fair opportunity to consider the grievance.

Jones did not give the system an opportunity to consider his complaint regarding his transfer to

the SHU pretrial unit.  Moreover, there is no evidence of record that indicates the VCC thwarted

Jones' ability to avail the prison grievance process.  For the above reasons, the court will grant

Warden Carroll's motion for summary judgment on the failure to exhaust administrative

remedies as to Manley and Jones.

   Warden Carroll argues, that because Stevenson did not submit a grievance

contemporaneously with his transfer to the SHU pretrial unit, the later filed grievance was

submitted out of time and, therefore, Stevenson failed to exhaust his administrative remedies.

The record reflects that Stevenson was transferred to the SHU pretrial on May 31, 2011, but he

did not submit a grievance complaining of the transfer until July 14, 2003, some two years

following the transfer.  Regardless, the grievance was not returned as untimely; it was returned

on the basis that inmates have no choice in their housing assignments.  Stevenson did not appeal

the finding.  Notably, the record reflects that the issue of the SHU pretrial was an appropriate

subject to grieve since it was not a classification decision.  Prison records indicate that Stevenson

did not appeal the decision, and Stevenson indicates in his opposition to the motion for summary

judgment that he interpreted the return of the grievance as a non-grievable issue and then

determined on his own that he did not need to appeal.  (D.I. 95 at 24-25.)

The record reflects that Stevenson has filed numerous grievances, and there is no evidence that he was precluded from utilizing the administrative process.  Stevenson opted not to seek further review.  Thus, his failure to utilize the proper internal procedures justifies summary judgment in favor of Warden Carroll.  *See Woodford*, 548 U.S. at 94-96.  The failure to properly exhaust is fatal to his claims.  "[I]t is beyond the power of this court . . . to excuse compliance with the exhaustion requirement."  *Nyhuis*, 204 F.3d at 73.  Accordingly, the court will grant Warden Carroll's motion for summary judgment on the failure to exhaust administrative remedies as to Stevenson.  Finally, even if the plaintiffs had exhausted their administrative remedies, as discussed below, summary judgment is still appropriate on behalf of Warden Carroll.

## B. Eleventh Amendment

Warden Carroll seeks summary judgment with regard to the official capacity claims that seek monetary damages.  Stevenson has not sued Warden Carroll for damages in his official capacity, but does seek injunctive relief against him in his official capacity.

The Eleventh Amendment shields states from suits by individuals absent a state's consent.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996).  "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citations omitted).  Thus, § 1983 claims for monetary damages against a state or a state official in his official capacity are barred by the Eleventh Amendment.  *See id.*  The State has not waived its immunity from suit in

15

federal court, and although Congress can abrogate a state's sovereign immunity, it did not do so through the enactment of 42 U.S.C. § 1983. *See Brooks-McCollum v. Delaware*, 213 F. App'x 92, 94 (3d Cir. 2007) (not published).

Accordingly, the doctrine of sovereign immunity makes the grant of summary judgment appropriate as to this issue. For the above reasons, the court will grant Warden Carroll's motion for summary judgment as to the official capacity claims raised against him that seek monetary damages.

## C. Due Process

The plaintiffs alleges that, as pretrial detainees, their placement in the SHU pretrial unit violated their substantive and procedural due process rights. Warden Carroll moves for summary judgment on the grounds that the plaintiffs failed to demonstrate violations of their due process rights.

### 1. Substantive Due Process

Unlike sentenced inmates, pretrial detainees have a liberty interest in being free from punishment prior to conviction under the Due Process Clause. *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979). "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Id.* at 538. Therefore, "if a restriction or condition is not reasonably related to a legitimate goal - if it is arbitrary or purposeless - a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id.* at 539.

16

Given that penological considerations are peculiarly within the province and professional

expertise of corrections officials, in the absence of substantial evidence in the record to indicate

that the officials have exaggerated their response, courts should ordinarily defer to the expert

judgment of corrections officials in determining whether restrictions or conditions are reasonably

related to the Government's interest in maintaining security and order and operating the

institution in a manageable fashion.  *Id.* at 540 n.23.  Unconstitutional punishment typically

includes both objective and subjective components. *Stevenson v. Carroll*, 495 F.3d 62, 68  (3d

Cir. 2007).  The objective component requires an inquiry into whether "the deprivation [was]

sufficiently serious" and the subjective component asks whether "the officials act[ed] with a

sufficiently culpable state of mind[.]"  *Id.* (citations omitted).

Stevenson argues that, even after discovery, the reasons for his confinement in the SHU

pretrial were unclear, noting that internal records describe he and Manley as "not a management

problem" prior to the time their death sentences were vacated.  With regard to Jones, the

plaintiffs argue that he was not named as a gang member or a participant in the investigative

report of the incident at Gander Hill.  Stevenson and Jones both argue that they were punished

when transferred to the SHU pretrial unit by reason of their pending charges and past disciplinary

infractions.

Contrary to the plaintiffs' positions, the record reflects that their placement in the SHU

pretrial unit was based upon prison security concerns.  Stevenson and Manley have not refuted

that they were transferred to the SHU pretrial unit because of concerns for their safety and those

around him.  In particular, prison officials took note that they were convicted for murdering a

State witness and prison officials reasonably believed their conduct foreshadowed future similar

17

conduct. In addition, once their bail was revoked, prison officials determined they were a

security risk. Jones' position is belied by the record. He is named in the second paragraph of the

internal investigative report and identified by his SBI number as one of the persons responsible

for starting the incident that led to his transfer to the SHU pretrial unit. The report concludes that

the inmates involved represented an extreme threat to the security of Gander Hill and

recommended housing Jones in a facility with a higher security level. While the plaintiffs'

privileges in the SHU pretrial unit were not the same as those in general population, they

nevertheless enjoyed privileges including commissary rights, visits, use of the telephone, the

ability to exercise, consistent with their status as a SHU pretrial detainee. At no time were the

plaintiffs told that punishment was the reason for the transfers to the SHU. Notably there is

nothing in the record to suggest that the transfer to the SHU was punitive. Rather, the plaintiffs

were moved to the SHU due to security concerns.

Finally, there is a paucity of evidence with regard to Warden Carroll's personal

involvement as to transfer to the SHU. Indeed, Jones indicates that it was not Warden Carroll,

but the warden at Gander Hill who was responsible for his transfer to the SHU pretrial.

Moreover, Warden Carroll was not the warden at the VCC when Stevenson and Manley were

initially transferred to the SHU pretrial as evidenced by the letter written to them by then Warden

Snyder on June 18, 2011. According to the record herein, the first involvement of Warden

Carroll in these matters was June 25, 2003 when he corresponded with Commissioner Taylor in

response to complaints from Stevenson and Manley. In addition, no administrative transfer

documentation for Stevenson and Manley mentions Warden Carroll. As is well-known, "a

defendant in a civil rights action must have personal involvement in the alleged wrongs to be

18

liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved," *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007), although "[p]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Warden Carroll's June 2003 letter to Commissioner Taylor could be construed as an acquiescence of the SHU pretrial housing assignment. However, the record reflects that this letter was written by Warden Carroll some two years after the initial transfer in response to Stevenson's and Manley's complaints.

After reviewing the record, the court concludes that the plaintiffs have not satisfied the objective component of their substantive due process claim. It is evident that the restrictions imposed upon the plaintiffs were reasonably related to the legitimate goal of maintaining their safety, as well as the security of the prison. Finally, there is no evidence of record of purposeful intent on the part of prison officials to punish the plaintiffs. For these reasons, the court will grant Warden Carroll's motion for summary judgment on the substantive due process issue.

### 2. Procedural Due Process

"Although pretrial detainees do not have a liberty interest in being confined in the general prison population, they do have a liberty interest in not being detained indefinitely in the SHU without explanation or review of their confinement." *Stevenson v. Carroll*, 495 F.3d at 69. "The protections due to sentenced inmates provide a floor for what pretrial detainees may expect." *Stevenson*, 495 F.3d at 69. In the context of a sentenced inmate who received periodic review of his status, to which he was permitted to respond the Third Circuit explained that although, "we have no difficulty concluding that eight years in administrative custody, with no

prospect of immediate release in the near future, is 'atypical' in relation to the ordinary incidents of prison life," the periodic reviews comported with the minimum constitutional standards for due process. *Shoats v. Horn*, 213 F.3d 140, 144-146 (3d Cir. 2000). The Third Circuit also affirmed a district court's finding that continued confinement of a sentenced inmate in administrative custody for five and a half years did not require a remedy because the record showed that the inmate was receiving the required periodic reviews of his status by the Program Review Committee. *See Williams v. Sebek*, 299 F. App'x 104, 107 (3d Cir. 2008) (not published); *See also Griffin v. Vaughn*, 112 F.3d 703 (3d Cir. 1997) (it is not atypical to be exposed to conditions of administrative custody for periods as long as fifteen months without a hearing as such stays are within the expected parameters of an inmate's sentence); *accord Jones v. Baker*, 155 F.3d 810, 813 (6th Cir. 1998) (confinement in administrative segregation for two and one-half years is not an atypical and significant hardship, cited with approval in *Fraise v. Terhune*, 283 F.3d 506, 523 (3d Cir. 2002)).

Prison officials must be "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 521 (1979). With respect to procedural due process, the procedures required by *Wolff v. McDonnell*, 418 U.S. (1974), apply if the restraint on liberty is imposed for disciplinary reasons; if the restraint is for 'administrative' purposes, the minimal procedures outlined in *Hewitt v. Helms*, 459 U.S. 460 (1983), are all that is required. *See Stevenson v. Carroll*, 495 F.3d at 70. "The degree of process required varies depending on the reason for the transfer, with greater process accorded to prisoners who are confined for disciplinary infractions than those moved for purely

administrative reasons." *Id.*

It has been determined that prison officials must provide pretrial detainees who are transferred into more restrictive housing for administrative purposes an explanation of the reason for their transfer as well as an opportunity to respond. *See Stevenson*, 495 F.3d at 70 (relying upon *Hewitt v. Helms*). An informal nonadversary review is satisfied when an inmate receives "some notice" and "an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Hewitt v. Helms*, 459 U.S. at 476. A written statement by the inmate will accomplish this purpose. *Id.* Due to the unique exigencies of prison management, and in accordance with *Hewitt*, the minimal exchange of paperwork need not occur prior to the transfer of a detainee. *Stevenson*, 495 F.3d at 71.

Stevenson and Manley were both transferred to the SHU pretrial on May 31, 2011, following reversal of their death sentences. Although not provided immediately, they were given written notice in January 2002 of the administrative move and the reason for the same. These notices contradict Stevenson's and Manley's allegations that they were not provided a reason for the transfers. In addition, the record reflects that both Stevenson's and Manley's housing assignments were reviewed periodically. With regard to Jones, who was transferred to the SHU pretrial on February 19, 2003, the evidence of record indicates that, by at least March 3, 2003, he had been told that the transfer was the result of "a fight." Each plaintiff had an opportunity to present his views regarding the transfer to prison officials through the grievance process. Only Stevenson availed himself of this right and, even then, he did not follow through the entire process. Finally, it is apparent from the record that the plaintiffs were not placed in the SHU pretrial for an indefinite period. Rather, Stevenson and Manley were housed there while awaiting

a second penalty hearing and resentencing in their capital case. Similarly, Jones was housed in the SHU pretrial while awaiting his capital trial. Once Stevenson and Manley were resentenced, they were given a new housing assignment on death row. Jones was housed in the SHU following sentencing.

Considering these facts, the court concludes that the plaintiffs received the minimal procedural due process protections they were due. Notably, there is no evidence of record implicating personal involvement on behalf of Warden Carroll with regard to the plaintiffs' procedural due process rights.

The evidence of record does not create a genuine issue of material fact for trial. Based upon the record, a reasonable jury could not find violations of the plaintiffs' right to procedural due process. Therefore, the court will grant Warden Carroll's motion for summary judgment on the procedural due process issue. Finally, even if the plaintiffs are correct in their positions that their due process rights were violated, as discussed below, Warden Carroll is entitled to qualified immunity.

### D. Qualified Immunity

Qualified immunity shields state officials from monetary damages unless: (1) the official violated a statutory or constitutional right, and (2) the right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, __U.S.__, 131 S.Ct. 2074, 2080 (2011). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 131 S.Ct. at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Courts have the discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). Assuming arguendo, that the plaintiffs' constitutional rights were violated, the court turns to the second prong of the qualified immunity test to determine whether the rights at issue were clearly established. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* at 203 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This standard "does not require a case directly on point" but does require that "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* For a right to be clearly established, the Third Circuit has instructed that "there must be sufficient precedent at the time of the action factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *McKee v. Hart*, 436 F.3d 165, 171 (3d Cir. 2006) (quoting *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001)).

The Supreme Court has repeatedly stated that the core of due process is "[t]he right to notice and a meaningful opportunity to be heard." *LaChance v. Erickson*, 522 U.S. 262, 266 (1998). Yet, the facts surrounding the plaintiffs' transfer to the SHU pretrial are unique, particularly with regard to Stevenson and Manley. Until the Third Circuit issued its ruling in *Stevenson* that reversed this court's dismissal of the case, no precedent existed that spoke to the issue of administrative detention of pretrial detainees facing capital punishment coupled with the security concerns of prison officials. In the context of a sentenced inmate, however, the Third

23

Circuit has opined that a sentenced inmate "could conceivably be held in administrative custody merely because his prior crimes reasonably foreshadow future misconduct." *Shoats v. Horn*, 213 F.3d 140, 146 (3d Cir. 2000).

In addition, *Stevenson* does not specifically describe the type of procedural process due. Instead it describes procedural due process in the most generic of terms. For example, administrative detention requires only an "informal nonadversary review" that "need not be extensive." *Stevenson*, 495 F.3d at 70, 71. Detainees must be provided "only an explanation of the reason for their transfer as well as an opportunity to respond," and all that is required is a "minimal exchange of paperwork" that need not occur prior to the transfer. *Id.*

Given the Third Circuit's pronouncement that a sentenced inmate could conceivable be held in administrative custody merely because his prior crimes reasonably foreshadow future misconduct, coupled with the fact that the plaintiffs' stays in the SHU pretrial were time-limited, the security concerns of the institution, and the availability of the grievance process to complain of their transfers, it cannot be said that it is unreasonable to believe that the Constitution merely requires notice and a hearing - not a formal notice or a formal hearing as proposed by the plaintiffs. Nothing suggests that Warden Carroll was "plainly incompetent" or that he "knowingly violate[d] the law." *al-Kidd*, 131 S.Ct. 2085. To rule otherwise would deny Warden Carroll the "breathing room" required by *al-Kidd* to make reasonable judgments regarding due process requirements for pretrial detainees who face capital trials and who pose security risks. The records reflects that the plaintiffs were placed in the SHU pretrial for their safety and the safety and security of DOC institutions. Accordingly, the court finds that Warden Carroll is entitled to qualified immunity.

24

## V. CONCLUSION

For the above reasons, the court will grant Warden Carroll's motion for leave to file excess pages and motion for extension of time to file the motion for summary judgment, and will deny his motion to strike the plaintiffs' memorandum in opposition to the motion for summary judgment. (D.I. 77, 88, 106.) In addition, the court will grant Warden Carroll's motion for summary judgment. (D.I. 90.)

An appropriate order will be issued.

CHIEF, UNITED STATES DISTRICT JUDGE

_____Dec 29_____, 2011

Wilmington, Delaware

25